**Richard B. PESIKOFF et al., Appellants,**

**v.**

**The SECRETARY OF LABOR.**

**No. 72–2206.**

United States Court of Appeals,
District of Columbia Circuit.

Argued Dec. 18, 1973.

Decided May 3, 1974.

Rehearing Denied May 31, 1974.
Certiorari Denied Nov. 25, 1974.
See 95 S.Ct. 525.

758

Jack Wasserman, Washington, D. C., with whom Benjamin M. Parker, Washington, D. C., was on the brief, for appellants.

Richard I. Chaifetz, Atty., Dept. of Justice, with whom Harold H. Titus, Jr., U. S. Atty. at the time the brief was filed, was on the brief, for appellee.

Before WRIGHT, ROBINSON and MacKINNON, Circuit Judges.

J. SKELLY WRIGHT, Circuit Judge:

Appellants seek review of a decision of the Secretary of Labor denying certification for appellant Quintero to enter the United States as an alien seeking to perform skilled or unskilled labor. Appellants filed in the District Court a complaint requesting, pursuant to 28 U.S.C. § 2201 (1970) and 5 U.S.C. § 704 (1970), a declaratory judgment that the Secretary's decision was an unlawful exercise of his authority under Section 212(a)(14) of the Immigration and Nationality Act, 8 U.S.C. § 1182(a)(14) (1970). The District Court dismissed the complaint for failure to state a cause of action, and this appeal followed. We find that the Secretary, in declining to grant certification, did not abuse the discretion vested in him by Section 212(a)(14) and affirm.

I

Appellant Pesikoff is a Houston child psychiatrist. His wife was a law student when this action was commenced. They are the parents of two preschool-age children. Because of the time de-

mands on him and his wife, Dr. Pesikoff felt it important that he obtain help in caring for his household. He states he attempted to find such assistance through newspaper advertisements, employment agencies, and inquiries with friends. He learned from the latter source that appellant Quintero, a citizen of Mexico with experience in caring for children, was available to work as a live-in maid. Dr. Pesikoff entered into a contract with Ms. Quintero under which she was to be paid $70 per week plus room and board for providing washing, ironing, cooking, and care for the two Pesikoff children. Though Ms. Quintero was to live in, Dr. Pesikoff represented to the Secretary that her work day was to have been only from 8:00 a. m. to 12:00 noon and from 2:00 p. m. to 6:00 p. m.

On or about July 20, 1971 appellants submitted a request to the Department of Labor that the Secretary, pursuant to Section 212(a)(14), certify Ms. Quintero for immigration into this country for the purpose of being employed by the Pesikoffs as a live-in maid. Section 212(a)(14) provides for exclusion from the United States of:

> Aliens seeking to enter the United States, for the purpose of performing skilled or unskilled labor, unless the Secretary of Labor has determined and certified to the Secretary of State and to the Attorney General that (A) there are not sufficient workers in the United States who are able, willing, qualified, and available at the time of application for a visa and admission to the United States and at the place to which the alien is destined to perform such skilled or unskilled labor, and (B) the employment of such aliens will not adversely affect the wages and working conditions of the workers in the United States similarly employed. * * *

8 U.S.C. § 1182(a)(14). A Department of Labor Manpower Administration officer in Dallas, Texas, to whom the Secretary's authority under this provision had been delegated, informed Dr. Pesi-

koff on July 28, 1971 that the Secretary could not issue for Ms. Quintero the certification required by Section 212(a)(14) because available job market information did not show that United States workers were unavailable for the job Ms. Quintero was to perform. Before denying Dr. Pesikoff's request the certifying officer had been advised by the Texas Employment Commission that there were approximately 180 maids registered in the Commission's Houston office. The Employment Commission also advised that inquiries of employers and perusals of newspaper advertisements enabled it to estimate that in excess of 100 maids were available for work. The Commission indicated, however, that very few of the registered workers would accept jobs that required cooking and that none were willing to live in.

In affirming the certifying officer's decision, the Labor Department's Assistant Regional Manpower Administrator in Texas cited the Employment Commission's report on the general availability of maids in Houston. The Administrator stated that the absence in Houston of maids willing to live in was irrelevant to the Pesikoff application because "based on the job described and hours of work, the live-in requirement is a personal preference and not a necessity in the performance of the job." In March 1972 appellants filed in the District Court their complaint against the Secretary, dismissal of which we now review.

## II

■ The Secretary contends that we must affirm the dismissal because both appellant Pesikoff and appellant Quintero lack standing to challenge denial of Section 212(a)(14) certification. Inasmuch as we hold that Dr. Pesikoff, as the prospective employer of the alien for whom certification was sought, does have standing and because Dr. Pesikoff and Ms. Quintero have jointly sought judicial review, it is not necessary for us to consider whether Ms. Quintero, as an alien outside the country, may also challenge denial of her certification.

The Supreme Court has held that Section 10(a) of the Administrative Procedure Act [1] confers standing to obtain review of administrative actions upon those parties who allege "that the challenged action had caused them [an] 'injury in fact,' * * * to an interest 'arguably within the zone of interests to be protected or regulated' by the statutes that the agencies were claimed to have violated." Sierra Club v. Morton, 405 U.S. 727, 733, 92 S.Ct. 1361, 1365, 31 L.Ed.2d 636 (1972). See Assn of Data Processing Service Organizations v. Camp, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970); Barlow v. Collins, 397 U.S. 159, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970); United States v. Students Challenging Regulatory Agency Procedures, 412 U.S. 669, 686–690, 93 S.Ct. 2405, 37 L.Ed.2d 235 (1973). An application of the Supreme Court's principles of standing to this case generates our conclusion that Dr. Pesikoff may seek judicial review of Ms. Quintero's certification denial. First, if Dr. Pesikoff is correct in alleging that he cannot find an American worker who is able to perform the domestic tasks which Ms. Quintero has contracted to perform, he has clearly suffered an "injury in fact" by the certification denial, for the Secretary's certification is a necessary precondition for Ms. Quintero to enter the United States to work for Dr. Pesikoff. Second, this injury is to an interest—that of American employers in obtaining qualified employees—arguably within the zone of interests to be protected or regulated by Section 212(a)(14). The section on its face suggests a congressional accommodation between this employer interest and the interest of American workers in being protected from importation of foreign labor which could affect their wages and working conditions or even eliminate their jobs. Though this accommodation takes the form of regulation of the employer's pursuit of his interest and the regulation subordinates this pursuit to the protection of American workers, the employer's need for qualified workers is clearly not ignored by the section.[2]

The Secretary bases his claim that prospective employers such as Dr. Pesikoff lack standing to invoke judicial review of his exercise of Section 212(a)(14) authority on three cases: Braude v. Wirtz, 9 Cir., 350 F.2d 702 (1965); Cobb v. Murrell, 5 Cir., 386 F.2d 947 (1967); Intercontinental Placement Service, Inc. v. Shultz, 3 Cir., 461 F.2d 222 (1972). None of these cases gives us pause. The Braude and Cobb courts did decline to grant standing to prospective employers to challenge certification denials, but these decisions were entered prior to the Supreme Court's liberalizing clarification of standing in Data Processing and Barlow, supra. The Braude and Cobb courts employed the old strict "legal right" test in applying Section 10(a) of the Administrative Procedure Act; since Data Processing and Barlow this test has been superseded by the two-step "injury in fact"—"zone of interests" analysis utilized above.[3] The Secretary's third case, Intercontinental Placement Service (IPS), was decided after Data Processing and Barlow and indeed relied on the two-step analysis which they established. The IPS court relied on this analysis, how-

1. Section 10(a), 5 U.S.C. § 702 (1970), provides:
   A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof.
2. The legislative history offers support for this description of the statute. See note 8 and text at note 8 infra.
3. A close reading of the Braude and Cobb decisions reveals that their conclusions on standing were heavily influenced by the notion that the Secretary's determinations under § 212(a)(14) are not subject to any judicial review. The Secretary makes no claim here that his § 212(a)(14) authority is unreviewable. In view of the Supreme Court's interpretation of § 10 of the Administrative Procedure Act, 5 U.S.C. § 701 (1970), in Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971), any such claim would in any case be without merit. See Secretary of Labor v. Farino, 7 Cir., 490 F.2d 885 (1973).

ever, to deny standing to an employment agency which locates positions for aliens with American employers. Though we do not necessarily concur in the *IPS* court's holding, we note that our grant of standing to a prospective employer need not conflict with that court's denial of standing to an employment agency for aliens.

We note finally that our grant of standing to Dr. Pesikoff is given direct support by Secretary of Labor v. Farino, 7 Cir., 490 F.2d 885 (1973), decided the day after oral argument in our case. The *Farino* court, applying the "injury in fact"—"zone of interest" analysis, held that prospective employers have standing to seek review of denials of Section 212(a)(14) certifications.[4]

### III

■ Having resolved the threshold standing issue in favor of appellant Pesikoff, we turn to the merits of his challenge to the Secretary's denial of Ms. Quintero's certification. Dr. Pesikoff asserts that the Secretary's denial constituted an abuse of his discretion under Section 212(a)(14) because it was based on insufficient evidence.[5] More specifically, Dr. Pesikoff argues that the Secretary should have presented evidence sufficient to prove that there were particular workers available, willing, able, and qualified to perform all the tasks Ms. Quintero had contracted to perform and to live in with the Pesikoffs while doing so.

■ ■ Our evaluation of Dr. Pesikoff's position must commence with an analysis of the section and its legislative history. We first stress that the section is written so as to set up a presumption that aliens should not be permitted to enter the United States for the purpose of performing labor because of the likely harmful impact of their admission on American workers. This presumption, the statutory language makes clear, can be overcome only if the Secretary of Labor has determined that the two conditions set forth in parts (A) and (B) of the subsection are met.[6] This structuring of the statute strongly indicates that the Secretary is not obligated to prove in the case of every alien seeking entry to perform labor that the conditions are not met. Given the presumption of the statute against admission, if the Secretary's consultation of the general labor market data readily available to him suggests that there is a pool of potential workers available to perform the job which the alien seeks, the burden should be placed on the alien or his putative employer to prove that it is not possible for the employer to find a qualified American worker.

This interpretation of the statute is supported by its legislative history. Before enactment of the 1965 amendments to the Immigration and Nationality Act, Section 212(a)(14) was structured to permit entry to aliens seeking to perform labor in the United States unless the Secretary of Labor certified that there were sufficient American workers available to perform such labor or that the employment of the aliens would adversely affect the wages and working conditions of American workers.[7] The

---

4. *See also* First Girl, Inc. v. Regional Manpower Administrator of U.S. Dept. of Labor, N.D.Ill., 361 F.Supp. 1339 (1973) (*sub silentio* grant of standing to prospective employer).

5. In order to reverse the Secretary's denial of certification, § 10(e)(2)(A) of the APA, 5 U.S.C. § 706(2)(A) (1970), requires us to find that the denial was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *See* Secretary of Labor v. Farino, *supra* note 3, 490 F.2d at 889–890. *See also* Citizens to Preserve

Overton Park, Inc. v. Volpe, *supra* note 3, 401 U.S. at 416.

6. Those conditions are, again:
   (A) there are not sufficient workers in the United States who are able, willing, qualified, and available * * *, and (B) the employment of such aliens will not adversely affect the wages and working conditions of the workers in the United States similarly employed.
   8 U.S.C. § 1182(a)(14) (1970).

7. Act of June 27, 1952, ch. 477, § 212(a)(14), 66 Stat. 183.

Senate and House reports on the 1965 amendments to the Act make clear that Congress, by restructuring Section 212(a)(14) to exclude such aliens unless the Secretary certified that there were *not* sufficient American workers available, intended to reverse the prior presumption favoring admission to strengthen the protection of the American labor market and to reduce the burden on the Secretary in implementing this protection.[8] Moreover, Senator Kennedy, who played a major role in shepherding the 1965 amendments through Congress, stated on the Senate floor:

> Under [the old] procedure, the Secretary certifies that aliens falling under certain occupational or skill definitions should be excluded because they will threaten domestic employment. The new bill reverses this procedure. *It places the burden of proving no adverse effect on the applying alien.* The intending immigrant must receive a certificate from the Secretary of Labor that his presence will not affect U. S. employment, wages, or working conditions.

8. The Senate report stated:
   Simultaneous with the abolition of national quotas, controls to protect the American labor market from an influx of both skilled and unskilled foreign labor are strengthened. * * * [T]he provision of existing law * * * has the effect of excluding any intending immigrant within the scope of the certification who would likely displace a qualified American worker or whose employment in the United States would adversely affect the wages and working conditions of workers similarly employed in the United States. Under the instant bill, this procedure is substantially changed. The primary responsibility is placed upon the intending immigrant to obtain the Secretary of Labor's clearance prior to the issuance of a visa establishing (1) that there are not sufficient workers in the United States at the alien's destination who are able, willing, and qualified to perform the skilled or unskilled labor and (2) that the employment of the alien will not adversely affect wages and working conditions of U. S. citizens similarly employed. * * * S.Rep.No.748, 89th Cong., 1st Sess., 15

111 Cong.Rec. (Part 18) 24227 (1965) (emphasis added).

■■ In light of our interpretation of Section 212(a)(14) and the legislative history supporting this interpretation,[9] we conclude that the Secretary's denial of Ms. Quintero's certification did not constitute an abuse of discretion. First, we find proper the Secretary's treatment of Dr. Pesikoff's live-in requirement for his maid as a personal preference irrelevant to determination of whether there was in Houston a pool of potential workers willing to perform the Pesikoffs' domestic tasks. If the Secretary were required to find an individual American worker who met all the personal specifications of the prospective employer of each alien seeking Section 212(a)(14) certification, the burden on him in performing his statutory duty to protect the American labor market would be much greater than Congress intended in passing the 1965 amendments to the Act. It is well within the Secretary's discretion to ignore employer specifications which he deems, in accordance with his labor market expertise, to be irrelevant to the basic job which the employer desires performed.[10]

(1965), U.S.Code Cong. & Admin.News, p. 3333. The House report stated:
   The amended section 212(a)(14) represents a substantial departure from existing law. * * * [P]rocedure is reversed under the amendment. Responsibility is placed upon the intending immigrant to obtain the Secretary of Labor's clearance prior to issuance of a visa. * * *
H.R.Rep.No.745, 89th Cong., 1st Sess., 14 (1965).

9. We are aware that some recent District Court cases make a contrary interpretation of the statute. *See* First Girl, Inc. v. Regional Manpower Administrator of U.S. Dept. of Labor, *supra* note 4; Digilab, Inc. v. Secretary of Labor, D.Mass., 357 F.Supp. 941 (1973); Bitang v. Regional Manpower Administrator of U.S. Dept. of Labor, N.D. Ill., 351 F.Supp. 1342 (1972); Golabek v. Regional Manpower Administrator, U.S. Dept. of Labor, E.D.Pa., 329 F.Supp. 892 (1971).

10. "The labor certification procedure was not designed to cater to the personal quirks of an employer * * *." Ozbirman v. Regional Manpower Administrator, U.S. Dept.

The Secretary may, therefore, survey the available labor market for a class of workers who, while possibly not meeting the prospective employer's personalized job description, do provide the employer with the potential for getting his job accomplished. The Secretary's treatment and classification of Dr. Pesikoff's employee request as one for a general maid who could live in or out was an appropriate exercise of the above described discretion. Dr. Pesikoff's statement to the Labor Department that Ms. Quintero would work only from 8:00 a. m. to 12:00 noon and 2:00 p. m. to 6:00 p. m. indicates that her need to live in is not significantly different from that of millions of American workers who readily and adequately perform their duties without living at their employment site.

▆▆▆ We think the Secretary's treatment of Dr. Pesikoff's live-in preference was appropriate for an additional reason. As set forth above, Section 212(a)(14) provides that in order to grant an alien labor certification the Secretary must determine, not only that there are not American workers available, but also that employment of the alien will not adversely affect American wages and working conditions. The Secretary could well predict that the wages and working conditions of American maids would be adversely affected if Americans seeking domestic help could import, at the prevailing wage for live-out daily maids, aliens to work as live-in maids who are almost continuously on call. There is nothing in the record which moves us to question Dr. Pesikoff's representation that Ms. Quintero would have limited working hours. However, if the Secretary were to deem relevant to his survey of the available American work force a live-in preference of an employer who represents that his maid will work limited daytime hours, an American employer intending to work an alien at least intermittently around the clock could, by simple misrepresentation, defeat one of the primary purposes of Section 212(a)(14).[11] Our analysis above of the section and its legislative history indicates that the Secretary has discretion to protect the American labor market against such employers with prophylactic procedures such as the employer personal preference disposition he made here.[12]

of Labor, S.D.N.Y., 335 F.Supp. 467, 474 (1971).

11. The likelihood of such misrepresentation is especially significant where, as here, the domestic employer has small children whose demands for attention do not observe limitations on working hours.

12. Dr. Pesikoff makes a subsidiary argument that the Secretary's certification denial must be overturned because it was based on an internal Labor Department field memorandum which directs the Secretary's delegates to deny certification to aliens seeking live-in maid work which could be performed by available American live-out maids or day-workers. Dr. Pesikoff's complaint alleges that this directive constitutes an agency rule which is invalid because it was not published in the Federal Register. Dr. Pesikoff bases his position on two sections of the APA: 5 U.S.C. §§ 552 & 553 (1970). Neither section gives him any aid.

Section 553 requires federal agencies to provide notice of proposed rule-making in the Federal Register and an opportunity for interested persons to comment on the proposed rules. "Interpretive rules" are exempted from these requirements, 5 U.S.C. § 553(b)(3)(A), however, and the Secretary's directive challenged here is such an interpretive rule. Interpretive rules, unlike the quasi-legislative rules which are subject to the prescriptions of § 553, are merely an agency's interpretation of a statute it is charged with implementing and create no law or have no effect beyond that of the statute. American President Lines, Ltd. v. FMC, 114 U.S. App.D.C. 418, 420–421, 316 F.2d 419, 421–422 (1963); Gibson Wine Co. v. Snyder, 90 U.S.App.D.C. 135, 137–138, 194 F.2d 329, 331–332 (1952); 1 K. Davis, Administrative Law Treatise § 5.03 (1958). Here the Secretary did not attempt to argue that the internal memorandum has any more legal force than does § 212(a)(14) directly. He denied Ms. Quintero's certification and argued to us that this denial was proper without ever making reference to the internal memorandum.

The notice requirements of § 552, the public information provision of the APA, are applicable to interpretive rules; federal agencies are to publish in the Federal Regis-

Given our conclusion that the Secretary's treatment of Dr. Pesikoff's live-in preference was proper and our analysis of Section 212(a)(14), we have no difficulty in finding the Secretary had adequate support for his denial of certification. The Secretary, prior to that denial, had been informed by the Texas Employment Commission that it estimated from independent sources that in excess of 100 workers were available for general maid work in Houston and that 180 workers were registered as maids at the Commission's Houston office. To be sure, the Employment Commission in its report to the Secretary stated that a majority of the registered maids were already employed on a part-time basis[13] and that very few were willing to cook.[14] We think, however, that the general data provided the Secretary by the Commission offered sufficient evidence of a pool of potential workers to support certification denial, at least in the absence of any evidence offered by Dr. Pesikoff or Ms. Quintero proving it was impossible to find an appropriate worker in this pool.[15] Dr. Pe-

sikoff apparently did not attempt to offer any such evidence to the Secretary, and he suggests to us no evidence he could offer on remand. He does not even represent that he made any attempt to contact the maids registered at the office. We think it clear that Congress did not intend Section 212(a)(14) to create an employment placement office in the Department of Labor; there is no onus on the Secretary to provide personal preference employers like Dr. Pesikoff with personal preference qualified American workers.

Affirmed.

MacKINNON, Circuit Judge, concurring in part and dissenting in part:

This case arises on appeal from an order of the district court dismissing under Rule 12(b)(6) a complaint for declaratory judgment under 28 U.S.C. § 2201 (1970) and for review under section 10(c) of the Administrative Procedure Act (5 U.S.C. § 704(1970)) of the denial of a request for a labor certification by the Secretary of Labor. I would reverse.

---

ter "statements of general policy or interpretations of general applicability." 5 U.S.C. § 552(a)(1)(D). However, the Secretary's failure to make such publication of his field memorandum gives no relief to Dr. Pesikoff. Section 552 states that "[e]xcept to the extent that a person has actual and timely notice of the terms thereof, a person may not in any manner be required to resort to, or be adversely affected by, a matter required to be published in the Federal Register and not so published." 5 U.S.C. § 552(a)(1)(E). Dr. Pesikoff was not adversely affected by not learning of the internal memorandum before this litigation, assuming such a late awareness. He would have stood in no better stead if he had had notice of the internal memorandum before filing his request for Ms. Quintero's certification. If he desires to avoid the memorandum's directive, he can still request certification by representing that Ms. Quintero will work both day and night although, as stressed in text, such a representation would suggest an adverse impact on American working conditions. Indeed, in view of the Secretary's lack of reference to the memorandum in his statement of denial and our finding that the statute directly supported his treatment of the live-in preference, we

cannot say that the Pesikoffs were affected by the memorandum at all. Appellants' position would not be advanced if we held the Secretary's general statement of policy as to the matters contained in the challenged internal memorandum to be completely void and without effect. *Compare* Lewis-Mota v. Secretary of Labor, 2 Cir., 469 F.2d 478, 482 (1972).

13. Although the Pesikoffs of course wanted a maid to work a full week, we take note of the fact that many part-time laborers seize an opportunity to transfer into a full-time position, at least when the pay is sufficient.

14. The Secretary of course might well have reasoned within his expertise that the number of maids willing to cook would be significantly increased if they were offered wages above the level prevailing in Houston for general maids.

15. "If the report of the State Employment Service stood unimpeached, we could not conclude that the Secretary's refusal to certify the alien workers was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" Secretary of Labor v. Farino, *supra* note 3, 490 F.2d at 891.

## I

Appellant Pesikoff is a child psychiatrist in Houston, Texas. At the time this action was commenced his wife was a law student and they had two children, aged two and four. The Pesikoffs felt it "mandatory that [they] obtain live-in domestic help, because of [their] busy professional schedules, to assist [them] with the children and the house."[1] Dr. Pesikoff made extensive efforts to obtain such help through newspaper advertisements, employment agencies and the assistance of friends. He learned that appellant Quintero, a native and citizen of Mexico, was qualified and willing to accept such employment and he accordingly applied on her behalf for the labor certification necessary to admit her to the United States. The application was denied on July 28, 1971 by the certifying officer and his decision was affirmed on appeal by an Assistant Regional Manpower Administrator on September 8, 1971. In March 1972 appellants filed their complaint against the Secretary, the dismissal of which gives rise to this appeal.

## II

The two central issues[2] raised on this appeal are, first, whether appellants have standing to contest the Secretary's determination under the applicable statute, and second, whether the Secretary's denial of certification can be sustained on the merits. The inquiry begins, of course, with section 212(a)(14) of the Immigration and Nationality Act (the Act), which provides in relevant part:

(a) *General classes.*

Except as otherwise provided in this chapter, the following classes of aliens shall be ineligible to receive visas and shall be excluded from admission into the United States:

\* \* \* \* \* \*

(14) Aliens seeking to enter the United States for the purpose of performing skilled or unskilled labor, unless the Secretary of Labor has determined and certified to the Secretary of State and to the Attorney General that (A) there are not sufficient workers in the United States who are able, willing, qualified, and available at the time of application for a visa and admission to the United States and at the place to which the alien is destined to perform such skilled or unskilled labor, and (B) the employment of such aliens will not adversely affect the wages and working conditions of the workers in the United States similarly employed.

8 U.S.C. § 1182(a)(14) (1970).

### A. *Standing*

I concur with the majority that a prospective employer of an alien worker has standing to contest the denial of a labor certificate under subsection (a)(14).[3] Section 10(a) of the Administrative Procedure Act (5 U.S.C. § 702 (1970)) grants standing to seek judicial review of agency action to any person adversely

---

1. Letter to Texas Employment Commission, July 15, 1971, Jt. App. at 9. Application for Alien Employment—Job Offer for Alien Employment.

2. The Secretary properly concedes that his determinations under section 212(a)(14) of the Immigration and Nationality Act, 8 U.S. C. § 1182(a)(14) (1970), are subject to judicial review, arguing only that such review must be narrowly limited to inquiry into possible abuse of discretion or clear error of law. Secretary's Br. at 7. Although the Secretary should and does possess considerable discretion in determinations made under section 212(a)(14), that section does state

readily perceivable and applicable law against which his decisions can be measured. *See* Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed. 2d 136 (1971). Therefore, while investing him with discretionary authority, section 212(a)(14)'s mandate to the Secretary falls short of the insulating "committed to agency discretion" language of the Administrative Procedure Act (5 U.S.C. § 701(a) (1970)).

3. In view of the disposition I would make herein I do not find it necessary to determine whether appellant Quintero, as a nonresident alien, has standing to bring this action.

affected or aggrieved by such action within the meaning of a relevant statute. Based upon the two step analysis established by Association of Data Processing Service Organizations, Inc. v. Camp, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970) and Barlow v. Collins, 397 U.S. 159, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970), it is my conclusion that Dr. Pesikoff has standing to bring the instant action. First, he has suffered "injury in fact" through the denial of entry to an alien he wishes to employ in circumstances which suggest the probability that he will be unable to find an acceptable substitute. Second, his interests as a prospective employer of an alien worker are "arguably within the zone of interests to be protected or regulated by" subsection (a)(14), since a review of the legislative history of this subsection demonstrates that it was intended to protect the jobs of American workers from inexpensive foreign labor through the regulation of certain employment practices of American employers.[4]

In Secretary of Labor v. Farino, 490 F.2d 885 (7th Cir. 1973), decided the day after oral argument in this case, it was held that employers of aliens who required labor certification under section 212(a)(14) had standing to seek review of denials of such certifications under APA section 10(a). There, the section 212(a)(14) certifications were necessary to obtain sixth preference visas for aliens apparently already in the United States so that they could continue their employment. *Farino,* also relying on the trend toward more liberalized rules of standing marked by *Data Processing* and *Barlow, supra,*[5] stated that the aliens' employers had standing because

> [i]t is clear that these plaintiffs have adequately alleged that they will be economically injured if not permitted to employ these aliens. Further, the

---

4. Although the dominant theme of section 212(a)(14) is the protection of the American laborer, it seeks simultaneously to accommodate the employer's interest in securing sufficient labor. Thus, section 212(a)(14) regulates an employment practice formerly regulated by

> the alien contract labor law, which became effective February 26, 1885, and was aimed at the practice of certain employers importing cheap labor from abroad. This importation practice began in 1869. Advertisements were printed offering inducements to immigrants to proceed to this country, particularly to the coal fields, for employment. Many advertisements asserted that several hundred men were needed in places where there were actually no vacancies. The object was to oversupply the demand for labor so that the domestic laborers would be forced to work at reduced wages.

> These abuses came to the attention of Congress about 1884. The House Committee on Labor found that the evils complained of by labor organizations existed to an alarming extent.

> The alien contract labor law made it unlawful to import aliens or assist in importation or migration of aliens into the United States, its Territories, or the District of Columbia under contract, made previous to the importation or migration, for the performance of labor or service of any kind in the United States. The law

made such contracts void and provided certain penalties.

H.R.Rep.No.1365, 82d Cong., 2d Sess. 12–13 (1952) (footnote omitted).

The legislative history of section 212(a)(14) firmly establishes a strong congressional intent

> to protect the American labor market from an influx of both skilled and unskilled foreign labor . . . who would likely displace a qualified American worker or whose employment in the United States would adversely affect the wages and working conditions of workers similarly employed in the United States.

S.Rep.No.748, 89th Cong., 1st Sess. 15 (1965), U.S.Code Cong. & Admin.News, p. 3333. In 1965 section 212(a)(14) was amended to its present form to deny entry to aliens absent the affirmative finding by the Secretary that the section's stated conditions were satisfied. Although characterized as a "substantial change" in existing law, *id.,* the amendment more aptly could be termed a radical shift in procedure.

5. I agree with the majority of this court and with the Seventh Circuit that the cases cited by the Secretary for the proposition that prospective employers of aliens lack standing in certification denial cases are no longer tenable in light of recent developments in the law of standing. *Farino,* 490 F.2d at 889.

legislative history makes clear that Section 1182(a)(14) was substituted for, and intended to fulfill the purpose of, the pre-existing "contract labor clauses." House Report No. 1365, 82d Cong., 2d Sess., 1952 U.S.Code Cong. and Adm.News, pp. 1653, 1661–1662, 1705. Thus potential employers of aliens are within the zone of interests to be regulated.

490 F.2d at 889.

### B. The "Personal Preference" Characterization

Aliens shall be denied entry into the United States for employment purposes unless the Secretary affirmatively determines that there are no "able, willing, qualified, and available" American workers. Act § 212(a)(14), 8 U.S.C. § 1182(a)(14). Applications for a labor certificate must be decided on an individual basis and the Secretary is required by regulation to consider the findings of state employment agencies in reaching his decision. 29 C.F.R. § 60.3 (1973). The Secretary also may conduct an independent investigation but there is no evidence as to whether one was made in this case. Thus the facts on which the denial of certification was based must be considered to be solely those supplied by the Texas Employment Commission to the Secretary: [6]

> [There are] approximately 180 Maids [and] approximately 125 Dayworkers . . . 75% . . . are working one to three days a week, but . . . are seeking extra days to fill the week. Many change jobs frequently and definitely are not interested in live-in work. Very few will accept jobs that require cooking. [Employers] find that it is seldom they can find an applicant who is desirable, or who can furnish valid references.

The labor certificate was denied in this case on the basis that there were American workers available.[7] The Secretary argues that (1) the Pesikoffs would only require the maid to work from 8:00 A.M. to 12:00 P.M. and from 2:00 to 6:00 P.M., (2) a day, non-live-in maid could fulfill this requirement adequately, and therefore, (3) their desire for a live-in maid was only a personal preference the denial of which was not an abuse of the Secretary's discretion.[8]

---

6. Exhibit ES–575 Transmittal Memorandum, July 20, 1971. It should also be noted that the letter affirming denial of certification referred only to information supplied to the Secretary by the state commission:

> At the time of the employer's application, we were advised by the local office of the Texas Employment Commission that there were 180 qualified and available U.S. workers for the job offered the alien, but that none was willing to live-in.

Letter to Jack Wasserman, counsel for appellants, from Sam W. King, Assistant Regional Manpower Administrator, September 8, 1971.

7. Section 212(a)(14) requires more than a finding that American workers are "available," for the statute speaks in terms of "able, willing, qualified, and available" workers. *See* First Girl, Inc. v. Regional Manpower Administrator of the U.S. Dept. of Labor, 361 F.Supp. 1339 (N.D.Ill.1973). I am unwilling perfunctorily to assume that the "available" workers to which the Secretary refers are necessarily also "able, willing, [and] qualified."

8. The initial denial by the Certifying Officer simply stated that "U.S. workers are available"; this was amplified on appeal by the Assistant Regional Manpower Administrator:

> The job duties listed in the application for a live-in worker do not differ from those required of a dayworker. When the job duties and conditions of employment are those normally identified with dayworkers, the Department of Labor can not grant certification for employment of immigrant live-in workers.
> Based on the job described and the hours of work, the live-in requirement is a personal preference and not a necessity in the performance of the job.

Letter, *supra* note 6.

The Secretary's delegate limited the set of available workers to the 180 maids (Letter, *supra* note 6), but 75 per cent or 135 of these were already working one to three days per week. Since it is not unreasonable for the Pesikoffs to want the same maid to work and care for their young children throughout the week, the available workers must be reduced to 45. Of these, "very few" will cook and "seldom" do they have

The pivotal issue is the reasonableness of the personal preference characterization,[9] for it is clear that no workers would accept live-in employment and that the certification accordingly would have to be granted if Dr. Pesikoff's desire for a live-in maid was something more than merely a "personal preference." The majority opinion finds the personal preference characterization in this case to be valid and dispositive. In reaching this conclusion, however, the majority has failed to correlate elements of the characterization with any support in the record. It is submitted that this is fundamental error and disregards a basic precept of judicial review. The approach thus taken allows the majority freely to dispense with any remand to the Secretary and avoids the opportunity to enunciate standards to govern both the instant and future cases in this area. A remand to the Secretary in this case would be particularly appropriate because prior cases have been dismissed for lack of standing. No person had standing to contest the Secretary's determinations under prior law and therefore he was free to act as he pleased. We should now set forth, so far as the facts of this case permit, standards that would inform and structure the Secretary's decisional process and, concomitantly, assure intelligent judicial review of future decisions.[10]

With these consequences of the majority's approach in mind, the specific defects of the court's opinion are now explored seriatim. First, the majority is concerned that a contrary decision would unduly burden the Secretary.[11] However, data on such matters as the status

---

valid references; moreover, there are about 48 employers competing for these few remaining applicants. Report of Texas Employment Commission, Complaint, Exhibit A. *See* note 7 *supra.*

9. At least as a general proposition the personal preference rule appears to be a rational implementation of the Act's purpose to protect the jobs of American workers. *See* note 4 *supra.* Where such special circumstances as those discussed in the text following note 11, *infra,* do not obtain, the advantages of a live-in maid over a dayworker are only marginal and thus not sufficient to offset the legislatively mandated objective of preserving employment for American workers.

10. In addition to the factors discussed in the text following this footnote, the Secretary should implement procedures designed to produce a record at the administrative level of sufficient substance to permit responsible judicial review. Such a procedure might include such things as an opportunity for the employer to present documentation of his efforts to secure a suitable employee, oral or written submissions, and, in general terms, provide an employer with a reasonable opportunity to present such arguments or explanations as would tend to refute the factual or legal predicates of the Secretary's adverse certification determinations.

11. The majority opinion states:
If the Secretary were required to find an individual American worker who met all the personal specifications of the prospective employer of each alien seeking Section 212(a)(14) certification, the burden on him in performing his statutory duty to protect the American labor market would be much greater than Congress intended in passing the 1965 amendments to the Act.
Majority Op. at 10. No one, of course, suggests that the Secretary shoulder such a burden in this case. In less flamboyant terms, underlying the majority's argument is a legitimate concern that the Secretary's resources should not be strained unduly in the effort to determine *certifications for any* particular class of workers. The Congress, however, thought that the Secretary could well discharge his responsibilities under section 212(a)(14) with presently available resources:
The Department of Labor should have no difficulty in adapting to this new procedure [under section 212(a)(14)] inasmuch as the Department, through its Bureau of Employment Security and affiliated State Employment Service agencies, presently determines availability of domestic workers and the standards of working conditions. There is no apparent need to increase facilities.
S.Rep.No.748, 89th Cong., 1st Sess. 15 (1965), U.S.Code Cong. & Admin.News, p. 3334. Moreover, the Secretary does possess data on the availability of live-in domestic workers, the specific class of employment at issue here. *See* text accompanying note 12 *infra.*
In any event, the simple fact remains that under section 212(a)(14) the Secretary has a statutory responsibility, triggered by an

and availability of domestic workers, both live-in and live-out, is something which the Department of Labor should routinely collect. Indeed, in 1969 the Department on its own initiative commenced "as standard procedure" the collection of data on the availability of live-in domestics on a bi-monthly basis, such data to be distributed regularly to the regional offices.[12]

Second, the opinion posits that Dr. Pesikoff's need for a live-in maid "is not significantly different from that of millions of American workers who reliably and adequately perform their duties without living at their employment site."[13] However, the Secretary must deal with each case on an individual basis[14] and there is no showing that he did anything more than apply a broad generalization to the specific circumstances of this case. The Department of Labor has recognized that a case involving parents who both work and have pre-school age children presents special considerations which should be explored. Guidelines in this area have been promulgated to "help

assure that regional offices make determinations that are consistent and reasonable."[15] For example, certification of an alien live-in domestic will be approved.

> [i]f there is absolutely no availability of live-in, live-out, or dayworkers because of *insurmountable transportation difficulties* or other specific identifiable reasons, and no adverse effect. . . .[16]

"Example II" of the guidelines provides:

> In addition to housekeeping, the duties specified include care of preschool age children . . . or similar hardship. [In this situation, if] there is absolutely no availability or adverse effect, *the basis for considering the stated condition for child care . . . must be fully explored* and when reasonable should be documented. Certification can be issued if it is ascertained that the job duties and hours are reasonable and that the *possible irregularity of attendance of dayworkers would create hardship.*[17]

application for a labor certification, to determine the availability of "able, willing and qualified" American workers for the specific employment category at issue. The adequacy with which that responsibility has been discharged in an individual case perforce must be measured against a record sufficient to permit and to withstand judicial scrutiny. Such a record does not exist in this case.

12. Field Memorandum No. 183–69, U.S. Dept. of Labor, Manpower Administration, October 10, 1969.

13. Majority Op. at 763. It may be assumed that the "millions of American workers" live away from their place of employment because that is their firm desire which they would not relinquish under any reasonable conditions. It can also be assumed that a significant number of Americans live at the site of their employment because their duties so require. It might be noted in this regard that the tax laws of this country specifically provide for the situation where an employee is required to live on the business premises by excluding from the employee's gross income the value of lodging furnished to him by his employer. Int.Rev.Code of 1954 § 119.

More to the point, the majority's generalization simply begs the question, that is, is

the specific class of workers here involved as reliable as other classes of employees. Moreover, a significant percentage of the "millions of Americans" to which the majority refers are employed in industries and businesses which would not grind to a halt if one or several employees failed to report to work. Employee absenteeism in large manufacturing industries, for example the automobile industry, is a well known problem and automobiles are still produced. By contrast, Dr. Pesikoff presumably is a busy child psychiatrist, his wife was a law student and assumedly now an attorney, and if their single employee failed to present herself in the morning, one of them would be forced to remain at home or leave the children unattended.

14. S.Rep.No.748, 89th Cong., 1st Sess. 15 (1965), U.S.Code Cong. & Admin.News, p. 3328.

15. Field Memorandum, *supra* note 12.

16. *Id.* (emphasis deleted and added)

17. *Id.* (emphasis deleted and added) The "General Comments" to the Field Memorandum state, *inter alia:*

(2) Care of pre-school children would apply when both parents work or when

These easily identifiable concerns—transportation difficulties, care of preschool age children and the possible irregularity of attendance of dayworkers (specifically tied to the problem of preschool age children)[18]—demonstrably establish, as the Secretary's own guidelines recognize, that special consideration is required for applications such as are involved in this case. The expertise underlying the promulgation of these guidelines belies the easy assumptions made in the majority opinion.

Moreover, the application of simple logic to the above guidelines, which are designed to insure "consistent and reasonable" action by the Secretary's delegates, supports the argument that the desire for a live-in maid in the circumstances of this case is something substantially more than merely a personal preference. The guidelines control the disposition of applications for certifications of alien, live-in domestic workers. However, "[i]f there is absolutely no availability of live-in, live-out, or dayworker,"[19] an alien still will not be granted certification for live-in employment absent a showing of additional need by the employer.[20] It seems logical that if all of these workers are to be classified as a homogeneous group for certification purposes, then when no domestics of any type are available an employer should be able freely to choose the type he desires. Yet quite clearly, where there are no workers of any kind available, a prospective employer of a live-in maid is required to prove the existence of special, "hardship" conditions before certification will issue.

This anomaly of logic may be resolved on either of two bases: either the Secretary has established an administrative bias against live-in domestics (for reasons not illuminated on this record) or the incidents of employment as a live-in domestic are in fact sufficiently distinct from those of a live-out domestic to support the conclusion that a desire for live-in help is something more than a personal preference. The former rationale is plainly unsupportable on this record under section 212(a)(14)(A), and the latter demonstrates, at a minimum, that a remand is necessary to explore the particular needs of Dr. Pesikoff in order to determine whether admission of an alien as a live-in maid for his family would be justified.

Finally, the majority asserts as an alternative, and perhaps the true, ground for its decision the principle that an alien may be certified under section 212(a)(14) only if his or her employment "will not adversely affect American wages and working conditions."[21] This correctly states the law but has no relevance to this case, since there are no

---

there is only one adult in the family and he or she works.

\*　　\*　　\*　　\*　　\*

(4) It should be noted that a split shift is not consistent with a claimed need for child or special care and warrants a reasonable explanation.

(5) Availability is not determined solely by applicants on file in a local office. Unemployment rates in the area, information from all community sources, and results of recent telephone surveys must be weighed.

With respect to number four, a "reasonable explanation" from Dr. Pesikoff could be forthcoming in a remanded proceeding before the Secretary along the lines suggested in note 10 *supra*. It might also be noted that these "General Comments" are not, of course, controlling on any issue in this case. *See* Majority Op., note 12.

18. The simple fact of life is that a two-year-old child requires special care and that in the normal course of events exigencies will occur which perforce demand a reliable and experienced person to handle adequately for the welfare of the child. Even assuming arguendo that the personal preference characterization is valid in this case, it is susceptible to significant doubt that the Pesikoffs will be able to secure an "able, willing and qualified" live-out maid, especially with respect to such a maid possessing references adequate to satisfy the legitimate parental concern that the person employed is suited to care for pre-school age children. *See* note 8 *supra*.

19. Field Memorandum, *supra* note 12 (emphasis deleted).

20. *See* "Example II," at text accompanying note 17 *supra*.

21. Majority Op. at 761. This concern is relevant only under section 212(a)(14)(B) and that subsection is not at issue in this case.

facts in the record that would even suggest such a possibility in this case. Thus the opinion states that the "Secretary could well predict" such adverse effects and that "by simple misrepresentation" an employer could gain admission of an alien he intended to exploit. It is suggested that these determinations properly are to be made in the first instance by the Secretary and are not susceptible to judicial supposition. This again demonstrates the appropriateness of a remand to the Secretary for his independent and expert consideration.

### III

Several general comments on the majority opinion relating to the incidence of the burden of proof and the necessity for a remand are also pertinent here. The majority places the burden of proving unavailability upon the prospective employer.[22] Although this is consistent with the statutory structure, it does present a problem not considered in the majority opinion. That is, the majority would have the employer carry the ultimate burden of persuasion that he has been unable, or that it is impossible, to find an "able, willing and qualified" American worker—in a sense, then, the majority would have him prove the existence of the non-existent, a sometimes difficult proposition. The most practical method of proving the negative facts required for certification to issue is that followed by Dr. Pesikoff in this case, but with perhaps greater documentation. He made extensive efforts to find a suitable employee through newspaper advertisements, employment agencies and the assistance of friends. When such efforts prove unsuccessful, the burden of production on the unavailability issue has been satisfied. The Secretary then must introduce sufficient competent evidence to overcome that adduced by the employer, failing which certification must issue.

Moreover, the nature of the proof presented by each side is necessarily im-

plicated and should be scrutinized carefully. For example, the Secretary may introduce statistics that tend to establish sufficient availability, while the employer may show that even with the most diligent and good faith efforts a suitable employee could not be found. This tension between theoretical and actual availability properly may be resolved in favor of the employer, for judges, no less than those they judge, live in the real world and must act accordingly. This resolution, moreover, does no violence to the statutory scheme envisioned by the Congress, since it may be assumed that the Congress equally was concerned only with the actual rather than the theoretical loss of employment by an American worker.

Finally, assuming for the moment that the Secretary's personal preference characterization is valid, a remand nonetheless would be appropriate in order to preserve the distinct possibility that Ms. Quintero could be certified for admission on the basis that even live-out domestics are not reasonably available. The majority opinion notes in this regard that the evidence represented by the Texas Employment Commission's report establishes "a pool of potential workers [sufficient] to support certification denial . . . ."[23] In the footnote to this statement,[24] the opinion posits that "[i]f the report of the State Employment Service stood unimpeached," the Secretary's determination must be sustained. The simple fact is, however, that the Commission's report on which the majority relies *has* been impeached, *and by the Secretary himself*. Counsel for the Secretary vigorously asserts:

> [A]ppellants would like the Court to rely on the statement of the [Texas] Employment Commission. As anyone who has dealt with state employment commissions knows, they are not a final and conclusive, nor even an efficient, repository for information with regard to positions and employees available. They exist primarily to ad-

22. Majority Op. at 761.

23. *Id.* at 764.

24. *Id.* at 764 n. 15.

minister unemployment compensation programs.[25]

If the Secretary, through his counsel, represents that this court cannot justifiably rely on such evidence, it is submitted that a remand is necessary to develop a record comprised of competent evidence, evidence of sufficient quality to insure the sound adjudication of the case at bar.

In summary, the majority, perhaps in the belief that a remand would be a futile gesture, finds the material facts itself without the benefit of a potentially illuminating factual inquiry at the district court or administrative level. Mindful of the fact that this case was dismissed on the pleadings by the district court for failure to state a cause of action and that the record at the administrative level could only fairly be termed barren, one arrives ineluctably at the conclusion that the majority has arrogated administrative and trial court functions an appellate court was never intended to and does not possess. The result is that Dr. Pesikoff's request— and it is fairly humble—that he be given the opportunity to prove the provable is spurned.

I dissent.