CONNECTICUT DEPARTMENT OF
CHILDREN AND YOUTH
SERVICES, Plaintiff,

v.

DEPARTMENT OF HEALTH AND
HUMAN SERVICES, et al.,
Defendants.

No. Civ. A. 88–1807.

United States District Court,
District of Columbia.

March 18, 1992.

Edward Modell, Dickstein, Shapiro & Morin, Washington, D.C., for plaintiff.

Daniel Bensing, U.S. Attorney's Office, Washington, D.C., for defendants.

## MEMORANDUM OPINION

THOMAS F. HOGAN, District Judge.

Now before the Court is the motion by the Connecticut Department of Children and Youth Services to set aside two decisions of the United States Department of Health and Human Services Grant Appeals Board, and the motion by the United States Department of Health and Human Services for judgment of affirmance of the same decisions. Essentially, the case involves a challenge to the initial determination by the Administration for Children, Youth and Families, Office of Human Development Services, that Connecticut was ineligible to retain fiscal year 1985 funds advanced to the state pursuant to title IV–B and title IV–E of the Social Security Act, and the decisions by the Grant Appeals Board upholding that determination.

The Court held a hearing on the pending motions on April 23, 1990. After careful consideration of the parties' briefs and supplemental pleadings, and after review of the oral arguments and the entire record in this case, the Court shall deny the motion by the Connecticut Department of Children and Youth Services to set aside and shall grant the motion by the United States Department of Health and Human Services for judgment of affirmance for the reasons that follow.

## BACKGROUND

On January 28, 1987, the Department of Health and Human Services (HHS) notified the Connecticut Department of Child and Youth Services (DCYS) that it was ineligible to retain the $747,925 in title IV–B of the Social Security Act funds that had been awarded to the state during fiscal year 1985 based on the state's self certification of eligibility for those funds. Connecticut filed a notice of appeal with the HHS's Grant Appeals Board on February 6, 1987. On April 14, 1987, HHS notified Connecticut that, based upon the same review, the state also was ineligible to retain $722,433 in title IV–E funds that had been awarded in FY 1985.

On June 2, 1987, Connecticut filed an appeal with the HHS Grant Appeals Board on both disallowances. On May 3, 1988, the Grant Appeals Board upheld the disallowance of $747,925 of funds awarded to Connecticut during federal fiscal year 1985, upholding the finding of the agency that Connecticut was ineligible to receive those title IV–B funds because the state failed to meet the § 427 foster care program requirements in a sufficient number of cases to achieve the 90% compliance rate required by HHS. The Grant Appeals Board also upheld the compliance review process used by the Agency. The Grant Appeals Board initially remanded the title IV–E portion of the case to the agency. However, on October 20, 1988, the Grant Appeals Board issued a second final agency decision that granted HHS's request for a reconsideration, and ruled that § 472(d) of the Act required the disallowance of *all* title IV–E funds. On July 1, 1988, Connecticut filed this action appealing the decisions of the

Grant Appeals Board.[1] Essentially, Connecticut argues that the May 3, 1988 and October 20, 1988 decisions by the Grant Appeals Board were arbitrary and capricious, an abuse of discretion, and were unsupported by substantial evidence.[2]

## FACTS

The Adoption Assistance and Child Welfare Act, enacted in 1980, amended title IV of the Social Security Act. The goal of the Act was to provide fiscal incentives to states to encourage more active monitoring of children in the foster care system. Specifically, § 427 of the 1980 Act provided a special incentive for states to ensure that all foster children under the care of the state receive a case review every six months. The title IV–B program provides funds to states for the improvement of child welfare services and establishes the title IV–E program. The title IV–E program provides reimbursement to the states for foster care maintenance and adoption assistance payments made by the states on behalf of eligible children.[3]

Congress authorized annual appropriations of $266 million, out of which each state would receive a proportionate share of the first $141 million. For a state to be eligible under title IV–E to receive a share of IV–B funds above the initial $141 million base, the state must certify, *inter alia*, that it:

(2) has implemented and is operating to the satisfaction of the Secretary—

(B) a case review system (as defined in section 675(5) of this title) for each child receiving foster care under the supervision the State....

42 U.S.C. § 627(a).

A case review system is defined as a procedure that assures

(A) each child has a case plan designed to achieve placement in the least restrictive (most family like) setting available and in close proximity to the parents' home, consistent with the best interest and special needs of the child,

(B) the status of each child is reviewed periodically but no less frequently than once every six months by either a court or by administrative review ...,

(C) with respect to each such child, procedural safeguards will be applied, among other things, to assure each child in foster care under the supervision of the state of a dispositional hearing to be held ... no later than eighteen months after the original placement ... [to] determine the future status of the child....

42 U.S.C. § 675(5).

To be eligible for title IV–E funds, a state must have

a plan approved by the Secretary which— ... (16) provides for the development of a case plan (as defined in section 675(1) of this title) for each child receiving foster care maintenance payments under the State plan and provides for a case review system which meets the requirements described in section 675(5)(B) of this title with respect to each such child....

42 U.S.C. § 671(a).

Failure to comply with the standards subjects a state to sanctions under § 471(b) of the Social Security Act, 42 U.S.C. § 671(b). That provision allows the secretary of HHS to stop payments to the state or to reduce such payments by an amount the secretary deems appropriate if the secretary determines that the state's plan is not in compliance with the requirements of the Act or if the secretary determines that in the administration of the plan there is substantial failure to comply with the provisions of the plan. *Id.*

Before HHS conducts an initial compliance review, a state must certify that it meets all the statutory requirements, i.e.,

---

**1.** Plaintiff filed an amended complaint incorporating the October 20, 1988 decision on December 15, 1988.

**2.** Connecticut also filed an appeal in the United States Claims Court on July 7, 1988. On January 9, 1989, the Claims Court dismissed the State's action without prejudice, based on this Court's jurisdiction over the case.

**3.** Eligibility for title IV–E funds rests on eligibility for title IV–B funds.

that each child in foster care has all the protections of § 427. To determine whether a state is operating a case review system satisfactorily, HHS samples part of the states' foster care case records for that fiscal year. The state is allowed to retain § 427 funds after an initial review indicates at least 66% of the case records reviewed are in compliance with § 427 requirements. The second review requires a 80% pass rate, and the triennial review mandates a 90% compliance level.[4]

Connecticut met the Secretary's required 66% pass rate in its first review in 1981, and the 80% pass rate in the 1982. The agency's decision to disallow the funds under Title IV–B was based on Connecticut's failure to pass the FY 1985 triennial review conducted on April 21—April 26, 1986. The Agency contends that Connecticut's pass rate dropped to 58% at the time of the triennial review.

The agency uses the methodology of sequential sampling to review the states' compliance levels. Under that methodology, a collection of records, in this case 250 of the 2300 FY 1985 cases, is selected for review. Reviewers follow a decisional table, based on a probability test, that indicates the number of cases that can be below standard before a conclusion that the state has failed the review is mandated. The decisional table also indicates the minimum number of cases that must pass the review before the reviewer can stop sampling and conclude that the state is eligible to receive funding. Using that table, the agency reviews the files until either the prescribed number of failed cases or passed cases is reached.

During the triennial review, there were approximately 2300 children in the Connecticut foster care system. A random group of 250 cases was selected for review. However, HHS reordered the sample of cases to be reviewed and selected the first 163 of the reordered sample for the review. Connecticut contended that this reordering of the random sample rendered the entire sample nonrandom, and thus invalidated the sequential sampling upon which the agency's finding of ineligibility was based. However, Connecticut does not allege any specific bias in the reordering.

Upon review of a challenge to the reordering, the Grant Appeals Board held that there was no entitlement to a sequence established by the random digit generation, and that there was no prohibition against the reordering that took place in the Connecticut review. Additionally, the Grant Appeals Board held that the reordering of a random sample would not logically alter the randomness of the sequence, unless it was done with bias, which Connecticut did not allege.

In this case, the decisional table indicated that 8 failures of the first 13 cases reviewed, 9 of the first 23, or 17 of the first 76, would result in ineligibility. Reviewers determined that none of the first thirteen cases passed the review. Accordingly, the agency determined the state had failed the triennial review and the state was notified on January 29, 1987 that it was ineligible to retain $747,925 in § 427 funds, and that it was ineligible for $722,433 in title IV–E money because of its ineligibility for the § 427 funds.

**4.** HHS never promulgated regulations setting forth the standards or procedures for determining whether a state had substantially complied with the plan. Rather, the agency issued Program Instructions. The 90% compliance standard was first announced in January, 1985 but was applied retroactively to FY 1985. Program Instruction 85–2, dated January 29, 1985, states in pertinent part:

The Secretary has exercised her discretion in determining whether States are operating their systems to her satisfaction by establishing acceptable levels of performance regarding the number of statutory protections which individual case records must contain and the number of satisfactory case records required for an acceptable State system.... States that meet the requirements of the SCR [Subsequent Compliance Review] will be reviewed for the third year following the year for which the SCR was conducted and for every third year thereafter. In this review, known as a Triennial Compliance Review (TCR), at least 90 percent of the State agency's foster care cases must meet the three critical elements and at least 15 of the 18 other statutory requirements.

The instruction also described the probability test and decisional table that the agency would use in the sequential sampling procedure.

On February 6, 1987, the state appealed to the Grant Appeals Board. The Board reversed the findings of the agency with respect to three of the eight failed cases read in the case sample. Accordingly, the agency reviewed an additional number of cases and determined that 77 of 163 cases did not meet the requirements of § 427.[5] On May 3, 1988 the Grant Appeals Board upheld the agency's compliance review process and determination that·the state had failed the review. However, the Board remanded the title IV–E portion of the case to the Agency to determine the amount of title IV–E funds claimed for children who were afforded foster care protections and to issue a revised disallowance that did not include payments made for those children. The Agency requested a reconsideration of the title IV–E portion of the Board's decision, and on October 24, 1988 the Board ruled that *all* title IV–E funds for children in voluntary placement must be disallowed under the Social Security Act.

Connecticut argues that the agency's 90% triennial review compliance standard must be considered an agency rule, and as such, is subject to the notice and comment requirements of the APA before promulgation.

> HHS contends the
> 90% standard for a triennial review was an outgrowth of the 66% pass rate for the Initial Compliance Review (ICR) and the 80% required pass rate for the Subsequent Compliance Review (SCR). The 66% and 80% pass figures were not published through notice and comment procedures. Instead, they were announced in Program Instruction 82–06, issued on June 3, 1982.

Defendants' Opposition at 13. The 90% pass standard also was not subject to notice and comment procedures. Instead, it was announced in Program Instruction 85–

2, issued on January 29, 1985. The summary of the Program Instruction states that

> [i]n order to pass the Triennial Compliance Review (TCR), at least 90 percent of the foster care cases reviewed must meet the three critical elements and at least 165 of the 18 other statutory requirements.

## ANALYSIS

 The Court must review the decisions of the Grant Appeals Board under the Administrative Procedure Act, 5 U.S.C. 706(2) and determine whether the decisions were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." *State of Indiana Department of Public Welfare v.· Bowen,* 686 F.Supp. 692, 694 (S.D.Ind.1987). Under this standard, the Court is not free to substitute its own judgment, but is limited to determining whether the agency has considered all relevant factors and whether the agency's decision· is reasonable and in accordance with the relevant statute. Under the Administrative Procedures Act, the standard of review is highly deferential to the agency. *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971).

Using this standard of review, this case appears to ride on two major issues. The first issue is whether the statute's requirement that a state "has implemented and is operating *to the satisfaction of the Secretary"* a case review system, commits such a review to the agency's discretion. The second issue is whether the agency's 90% triennial review standard is a legislative rule or an interpretive rule.

Connecticut argues that GAB's decision was arbitrary and capricious, overly technical, and inconsistent with congressional intent.[6] However, the Court finds no basis

---

5. When the Agency informally reviewed the entire sample of 163 cases, the agency determined that 77 were out of compliance. After a more careful review, the Agency determined that 73 cases were not in compliance. The Grant Appeals Board reversed the agency's findings on four cases, leaving a pass rate in FY 1985 of 94 out of 163 cases, or approximately 58%.

6. On April 13, 1990, Connecticut filed a "notice of filing" of a statement of Wade F. Horn, Commissioner of HHS' Administration for Children, Youth and Families. Commissioner Horn's statement includes a comment that the focus of the states' compliance activities has frequently become technical compliance with certain key terms and phrases, rather than on the protec-

for Connecticut's argument that the 90% standard is overly technical or contrary to the Act. Rather, the Act itself has been described as stringent, and couched in specific, obligatory terms. *See State of Vermont Department of Social Services v. U.S. Department of Health and Human Services*, 798 F.2d 57, 63 (2d Cir.1986), *cert. denied*, 479 U.S. 1064, 107 S.Ct. 950, 93 L.Ed.2d 999 (1987); *Lynch v. King*, 550 F.Supp. 325, 350 (D.Mass.1982). The intent of Congress is clear from the statute— state agencies must strictly comply with the mandates of ensuring that all foster care children are protected from "foster care drift." Accordingly, § 427 funding is an offer of a monetary award for state agencies that demonstrate stringent compliance with the statutory mandates.

 Additionally, the statute's broad delegation to the secretary to decide what constitutes satisfactory compliance with the procedures required by the Act, gives this Court no standard to use in evaluating the GAB's decision. Section 427 provides that the State must certify, *inter alia*, that it:

(2) has implemented and is operating *to the satisfaction of the Secretary* —(B) a case review system ... for each child receiving foster care under the supervision of the State....

42 U.S.C. § 627(a) (emphasis supplied). Based on this language, the Court finds that the secretary's action is "committed to agency discretion by law." *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971); *Heckler v. Chaney*, 470 U.S. 821, 105 S.Ct.

1649, 84 L.Ed.2d 714 (1985). Thus, the 90% standard is a permissible construction of the statute, given Congress' intention to leave to the secretary the task of deciding what constitutes satisfactory compliance.

Because the secretary's action is unreviewable as committed to agency discretion by law, HHS argues that its failure to use notice and comment rulemaking in promulgating PI 85–02 has no bearing on this case. Although the Court will not substitute its judgment for that of the agency, there still remains the question of whether or not HHS was required to publish the 90% standard, i.e., whether or not it is a legislative or interpretative rule. However, proper judicial review of the 90% standard at this stage is limited to determining whether any potential procedural right of the plaintiff has been violated by the agency's failure to promulgate rules.[7]

 If the 90% standard is a legislative rule, it is subject to the notice and comment requirements of the Administrative Procedure Act. However, the APA specifically excludes interpretative rules from its notice and comment procedures. This Circuit set out general principles to be used in determining whether or not a rule is interpretative or legislative in *General Motors Corp. v. Ruckelshaus*, 742 F.2d 1561, 1565 (D.C.Cir.1984) (*en banc*), *cert. denied*, 471 U.S. 1074, 105 S.Ct. 2153, 85 L.Ed.2d 509 (1985). An agency's characterization of the rule is "relevant," although not dispositive.

An interpretative rule simply states what the administrative agency thinks the statute means, and only 'reminds' affect-

tion of children, as Congress intended. Although Commissioner Horn's statement may indicate a need for Congress to amend the Act or for HHS to amend its regulations, amending regulations and statutes is not a proper task for the courts. Commissioner Horn also indicated that HHS was in the process of developing regulations for § 427 and that he anticipated publishing a Notice of Proposed Rulemaking in the near future. As a policy matter, the concerns recognized by Commissioner Horn are exactly the kind of issues that can be raised by interested parties during the process of publishing proposed rules if HHS proceeds along such a course.

7. The Court does not find it necessary to go so far as the defendants propose with respect to this issue. Defendants' view would suggest that any time an agency has complete discretion to adopt regulations, the agency would have no obligation to proceed under notice and comment rulemaking. Further, it appears to the Court that there would be no remedy for someone who was subject to a decision of an agency based on a rule that was adopted without notice and comment. However, because the Court finds that the rules were interpretive rules, and not legislative rules subject to the notice and comment requirements of the APA, the Court does not rule on this issue.

ed parties of existing duties. On the other hand, if by its action the agency intends to create new law, rights or duties, the rule is properly considered to be a legislative rule.

*Id.,* citing *Citizens to Save Spencer County v. Environmental Protection Agency,* 600 F.2d 844, 876 n. 153 (D.C.Cir.1979) (citations omitted). Legislative rules are rules in which the agency seeks to fill gaps left by the statutory scheme. *Spencer County,* 600 F.2d at 879.

In *United Technologies Corp. v. Environmental Protection Agency,* 821 F.2d 714 (D.C.Cir.1987), the D.C. Circuit explained:

> If the rule is based on specific statutory provisions, and its validity stands or falls on the correctness of the agency's interpretation of those provisions, it is an interpretative rule. If, however, the rule is based on an agency's power to exercise its judgment as to how best to implement a general statutory mandate, the rule is likely a legislative one.

*Id.* at 719–20.

■ In this case, PI–85–02, in which the agency set forth the 90% standard, is not a binding legislative rule. The standard does not create new law setting forth entitlement to § 427 funds, but merely provides guidance to the states and agency on how § 427 compliance reviews will take place. It is the statute itself that sets forth the requirements under the Act. *Cf. Pesikoff v. Secretary of Labor,* 501 F.2d 757, 763 n. 12 (D.C.Cir.), *cert. denied,* 419 U.S. 1038, 95 S.Ct. 525, 42 L.Ed.2d 315 (1974).

The 90% compliance standard established in PI 85–02 creates no new requirements, but merely demonstrates an exercise of administrative discretion to allow some deviation from perfect compliance with the statute. The statute clearly allows such discretion. Review of the state's compliance with the statutorily required procedures is delegated to the agency through the statutory language "and is operating *to*

*the satisfaction of the secretary....*" The legal standard governing the awarding of funds is set forth in the statute itself, through the requirements that each child have a review every 6 months, and that there be a dispositional hearing after 18 months.[8] Therefore, it is not the program instruction, but the statute itself that creates law and determines rights by mandating the behavior of the individual states.

The reorganization of the state's randomized files is of no concern to the Court. The Grant Appeals Board conducted an evidentiary hearing on this issue, and found that there was no entitlement to a particularly organized random sample. Additionally, the Grant Appeals Board found, and the Court concurs, that Connecticut suffered no harm from the reordering of the files. Because the statute delegates to the Secretary the review of satisfactory compliance with the requirements of the statute, the agency has complete discretion in determining how it will conduct its reviews.

The Court notes that the Grant Appeals Board properly upheld the Agency's disallowance of the title IV–E funds (the October 3, 1988 decision) because the GAB correctly ruled that Connecticut was ineligible for funding under title IV–B. The clear language of the Act provides that funding will only be allowed if the state has fulfilled all of its obligations. Section 427(b) conditions the receipt of funding on meeting the requirements of § 427(a), which includes the requirement of a case review system. Connecticut's failure to meet the requirements of an adequate case review system precludes the state from retaining the title IV–E funds. The Grant Appeals Board's decision was based upon the interaction of these statutory provisions and is supported fully by the plain language of the statute. Additionally, § 474(b) of the Social Security Act allows the secretary to disallow certain payments and to recover those payments when a state is determined to be ineligible to retain funds it has already received.

---

**8.** The Court notes that even if the 90% rule were not in effect because PI–85–02 required notice and comment rulemaking, Connecticut did not comply with the plain requirements of the statu-

tory language. *Cf. Florida Department of Health and Rehabilitative Services v. Department of Health and Human Services,* No. 85–7159 (September 28, 1990 N.D.Fla.)

Although the Court notes that the agency retroactively applied the 90% standard to Connecticut[9], this would be relevant only if the Court determined that the 90% standard were a legislative rule. In *Bowen v. Georgetown University Hospital*, 488 U.S. 204, 109 S.Ct. 468, 471, 102 L.Ed.2d 493 (1988), the Court held that

> ... a statutory grant of legislative rule-making authority will not, as a general matter, be understood to encompass the power to promulgate retroactive rules unless that power is conveyed by Congress in express terms.

Because the Court has already found that the rule was an interpretive agency rule, and not a legislative rule that would have been subject to the notice and comment requirements, this attack is not relevant.

## CONCLUSION

For all of the foregoing reasons, the Court shall deny the motion to set aside filed by the Connecticut Department of Children and Youth Services, and shall grant the motion by the United States Department of Health and Human Services for judgment of affirmance.

---

**9.** PI 85–02 was not issued until January 29, 1985 and HHS concedes that it did not come to Connecticut's attention until 1985. HHS conducted its review of Connecticut during 1985, using data before the adoption of PI–85–02.