ACUPUNCTURE CENTER OF WASH-
INGTON and Yann Theresa Kao

v.

John T. DUNLOP, Secretary of Labor, and
Lorenzo M. White, acting Director, Of-
fice of Employment Service, Appellants.

No. 74–1050.

United States Court of Appeals,
District of Columbia Circuit.

Argued Dec. 5, 1974.

Decided Jan. 16, 1976.

Certiorari Denied Oct. 4, 1976.

See 97 S.Ct. 62.

ington, D. C., was on the brief, for appellees.

Richard I. Chaifetz, Atty., Dept. of Justice, with whom John L. Murphy, Chief, Government Regulations Section, Crim. Div., Dept. of Justice, was on the brief, for appellants.

Arnold P. Lutzker, Washington, D. C., with whom Daniel M. Redmond, Wash-

Before LUMBARD,* Senior Circuit Judge for the Second Circuit, and McGOWAN and ROBINSON, Circuit Judges.

Opinion for the Court filed by Circuit Judge SPOTTSWOOD W. ROBINSON, III.

SPOTTSWOOD W. ROBINSON, III, Circuit Judge:

This controversy stems from decisions of the Secretary of Labor [1] declining to certify the existence of conditions, set by Section 212(a)(14) of the Immigration and Nationality Act,[2] which would enable appellee Yann Theresa Kao to remain in the United States as an alien performing labor for appellee Acupuncture Center of Washington. In their suit for declaratory relief, the District Court entered a summary judgment remanding the case for further administrative proceedings,[3] and the Secretary now appeals. We find, upon scrutiny of the administrative record,[4] that our decision in *Pesikoff v. Secretary of Labor,*[5] rendered during pendency of the appeal, requires us to sustain the Secretary's position.

In relevant part, Section 212(a)(14) calls for exclusion from the United States of aliens seeking to perform skilled or unskilled labor unless the Secretary determines and certifies that two circumstances coexist.[6] The first is that "there are not

---

* Sitting by designation pursuant to 28 U.S.C. § 294(d) (1970).

1. See note 27 *infra.*

2. Act of June 27, 1952, ch. 477, tit. II, ch. 2, § 212(a)(14), 66 Stat. 182, as amended, 8 U.S.C. § 1182(a)(14) (1970).

3. *Acupuncture Center v. Brennan,* 364 F.Supp. 1038 (D.D.C.1973).

4. Since, as we later point out, text *infra* at note 70, judicial review of the Secretary's action under § 212(a)(14) must be conducted on the basis of the administrative record, the factual material we utilize is drawn exclusively from that record, which hereinafter is cited "A.R."

5. 163 U.S.App.D.C. 197, 501 F.2d 757, *cert. denied,* 419 U.S. 1038, 95 S.Ct. 525, 42 L.Ed.2d 315 (1974).

6. Section 212(a)(14) provides in pertinent part:

Sec. 212. (a) Except as otherwise provided in this [Act], the following classes of aliens shall be ineligible to receive visas and shall be excluded from admission into the United States:

.   .   .   .   .

(14) Aliens seeking to enter the United States, for the purpose of performing skilled or unskilled labor, unless the Secretary of Labor has determined and certified to the Secretary of State and to the Attorney General that (A) there are not sufficient workers in the United States who are able, willing, qualified, and available at the time of application for a visa

sufficient workers in the United States who are able, willing, qualified, and available at the time of application for a visa and admission to the United States and at the place to which the alien is destined to perform such skilled or unskilled labor."[7] The second is that "the employment of such aliens will not adversely affect the wages and working conditions of the workers in the United States similarly employed."[8] In the case at bar, the Secretary refused a certification and the District Court, holding that the Secretary abused his discretion, returned the case to him for additional proceedings.[9]

Our review has encompassed careful analysis of the challenged decisions, administrative and judicial, as well as their common background. This opinion examines the application for certification,[10] the Secretary's determinations[11] and the District Court's disposition.[12] It then identifies the governing legal principles.[13] It concludes with an application of those principles to the Secretary's adjudications and an exposition of the reasoning compelling us to differ with the District Court.[14]

and admission to the United States and at the place to which the alien is destined to perform such skilled or unskilled labor, and (B) the employment of such aliens will not adversely affect the wages and working conditions of the workers in the United States similarly employed.
8 U.S.C. § 1182(a)(14) (1970).

7.  See note 6 *supra.*

8.  See note 6 *supra.*

9.  *Acupuncture Center v. Brennan, supra* note 3.

10.  Part I *infra.*

11.  Part II *infra.*

12.  Part III *infra.*

13.  Part IV *infra.*

14.  Part V *infra.*

15.  Born in China, and a citizen of the Republic of China, Ms. Kao later worked as bookkeeper and Chinese-English interpreter in Taichung, Taiwan, where she also attended Providence College. There she pursued a major course of

## I.  THE APPLICATION

Ms. Kao, an alien, was admitted to the United States in January, 1970, as a nonimmigrant student.[15] She attended college in Kansas until May, 1972,[16] and worked as a Chinese-English interpreter in New York from July to December of that year,[17] when she assumed her present employment at Acupuncture Center of Washington. Shortly thereafter, the Center submitted an application for an alien employment certification[18] to the Department of Labor.[19] In addition to a summary of Ms. Kao's qualifications,[20] including varying degrees of fluency in English and Chinese dialects,[21] the application set forth the Center's offer of a job as senior interpreter, bookkeeper and administrator.[22] The employee's duties were described thusly:

Employer amploys [*sic*] numerous Chinese practitioners of Acupuncture who speak various dialects of Chinese and little English. These practitioners are supervised by one or more licensed MD's. Alien applicant will be required to intelligently perform various administrative tasks for the Chinese practitioners, who

study in English literature and history, and earned the bachelor of arts degree in 1967. Following graduation she was chosen as an assistant of the College, leaving in 1970 for higher education in the United States.

16.  Fort Hays Kansas State College, from which she received the master of arts degree in business administration.

17.  Her employer there was Acupuncture Center of New York, where apparently she gained some familiarity with acupuncture terminology and practice.

18.  A.R. 15–16, 20–21.

19.  See note 27 *infra.* The Center also submitted a similar application for another alien employee, which the Secretary likewise denied. That action is not before us on this appeal.

20.  A.R. 20–21.

21.  The statement was "Read, write & speak English, Mandarin, Taiwanese, Cantonese (Read, write, understand) . . . .."

22.  A.R. 15–16.

communicate in Chinese. In addition, alien applicant will act as interpretor [*sic*] between American patients and Chinese practitioners.

Alien will also be responsible for all bookkeeping.[23]

The application specified as minimum job requirements a high school diploma, four years of collegiate study, a bachelor of arts degree as an English major, a degree in accounting or equivalent experience, and two years' experience as a bilingual secretary.[24] As special requirements, the job offer stated that the employee "[m]ust be intelligent, personable and able to communicate in English and various dialects of Chinese."[25] As readily seen, these prerequisites matched Ms. Kao's credentials.[26]

## II. THE SECRETARY'S DECISIONS

As thus formulated, the application was disapproved by the Secretary[27] "because resident workers were available to perform the required job duties"[28] and "because the job requirements were too restrictive."[29] By separate letters from the Center[30] and its counsel,[31] reconsideration of that disposition was requested. Counsel's letter recited that Ms. Kao spoke "many Chinese dialects,"[32] "act[ed] in a laision [*sic*] capacity

between Chinese and American Doctors and patients"[33] and "translate[d] medical terminology which is vital to the functioning of the center."[34] The Center's letter declared that Ms. Kao

function[s] as interpreter[], speaking fluent Chinese, English, Mandarin, Cantonese and Shanghai dialects.[35] Many applicants for [the] position[] were interviewed, but failed to speak the requisite number of dialects. Not all the Doctors at the Center speak the same dialect, and therefore for accurate translation between Chinese Doctor, American Doctor and patient, such fluency is a requisite.[36]

That letter also laid claim to a "proficient understanding of Acupuncture terminology and science" by Ms. Kao[37] and, while acknowledging "that there are a number of Chinese speaking people in the Washington area who can translate into English,"[38] asserted that Ms. Kao's "broad translating abilities and intimate knowledge of Acupuncture practice and terminology provides the Center with talent which is not easily replaced."[39] The letter further stated that the Center had

directed the placing of numerous advertisements for skilled and multi-lingual translators in many Chinese newspapers

23. A.R. 16.

24. A.R. 16.

25. A.R. 16.

26. As the Secretary was later to observe, "[t]he original job requirements and the alien's qualifications as listed . . . are identical." A.R. 2.

27. The Secretary has delegated the powers conferred, and assigned the duties imposed, by § 212(a)(14) to personnel within the Manpower Administration of the Department of Labor. With exceptions not relevant here, an application for alien certification is initially passed on by a certifying officer in the geographical area wherein the employment is to occur. 29 C.F.R. § 60.4(a) (1975). A denial of certification by the certifying officer is subject to review by the Regional Director for that area or his designated representative, whose determination is final. *Id.* § 60.4(c).

28. A.R. 3.

29. A.R. 3.

30. A.R. 6–7.

31. A.R. 5.

32. A.R. 5. See note 35 *infra*.

33. A.R. 5.

34. A.R. 5.

35. A.R. 6. We are unable fully to reconcile this representation with Ms. Kao's own statement which, as we understand it, does not claim *speech* fluency in all three Chinese dialects, and does not mention Shanghai at all. See note 21 *supra*.

36. A.R. 6.

37. A.R. 6.

38. A.R. 6.

39. A.R. 6.

including the China Post and The Chinese Journal . . . but the responses have been very poor. Those who did answer the advertisements did not possess the diverse dialect translation abilities of [Ms. Kao], nor [her] intimate knowledge of Acupuncture terminology and practice.[40]

In addition to these communications, the administrative record reflects that the application for certification was amended to remove the job requirements earlier held to be unduly restrictive.[41]

On reconsideration, the Secretary adhered to his original disposition.[42] While the amendment of the application had eliminated the job requirements partly responsible for the earlier decision, the Secretary advised that

> based on information available to this office, we must conclude that sufficient resident workers remain available in the Washington Metropolitan Area to perform the job duties required. While we recognize that you may prefer workers who are familiar with acupuncture terminology and practice, this does not appear to be a necessary occupational consideration and only impedes effective recruitment of an otherwise qualified local worker.[43]

So, the Secretary concluded, "[i]ssuance of certification[] under the circumstances described above would be contrary to the provisions of the immigration law."[44]

The administrative record reveals the foundations upon which the essential elements of the Secretary's decisions rested.[45] As to availability of domestic workers, the Secretary said:

> In processing the initial application, contact was made with Mr. Winston Tsai, legal counselor to the D. C. Chinese Cultural Association and the Formosan Club

of America, Incorporated. Mr. Tsai indicated a total membership in both organizations of 600 U.S. Citizens who are native Chinese. Many of the members are students or unemployed businessmen who would be available for full-time employment as Chinese interpreters. Mr. Tsai indicated that in excess of 15 of those available possessed knowledge of English and various Chinese dialects. . . .[46]

> Recent availability contacts reveal that there are qualified Chinese interpreters available in the local area who generally possess knowledge of one or two different dialects. D. C. Manpower Administration files show four Chinese interpreters one of whom is fluent in both the Mandarin and Cantonese dialects. The remaining three do not specify the dialects spoken, and attempts to contact these applicants for further information have been unproductive. The Language Services Division of the Department of State (Mr. Fukuda) can refer two applicants with fluency in Mandarin Chinese but feels it would be difficult to locate interpreters with fluency in three dialects. Winston Tsai has advised that he has two applicants available for immediate referral, one of whom possesses fluency in Mandarin, Cantonese and Shanghai dialects the combination specifically required by the employer. The second applicant is fluent in Mandarin, Shanghai and Taiwanese. Mr. Tsai has indicated that he will forward a letter advising of the availability of these two applicants.[47]

The Secretary added:

> In addition, the clientele to be served by such an establishment in this community obviously must be primarily English speaking. Consequently, the Chinese language requirements are apparently iden-

---

**40.** A.R. 6.

**41.** A.R. 3. See text *supra* at notes 24, 25.

**42.** A.R. 3–4.

**43.** A.R. 3.

**44.** A.R. 3.

**45.** This appears from a memorandum, later prepared by the author of the Secretary's decision, to the Assistant Solicitor of Labor for Manpower. A.R. 1–2.

**46.** A.R. 1.

**47.** A.R. 2.

tified as a necessary requirement to communicate with the practitioners. Assuming that the practitioners communicate with each other in one or two common dialects, it is difficult to understand the requirement for numerous Chinese dialects as a necessity. The letter of reconsideration did not sufficiently address this situation to the satisfaction of the Department of Labor for certification of an alien worker.[48]

And, the Secretary continued, "[t]he requirement of familiarity with acupuncture terminology and techniques, which was added by the employer in his review request, was regarded as overly restrictive, since the acquisition of specific technical jargon is a normal part of on-the-job training received on any job."[49] Soon after denial of reconsideration, appellants instituted the litigation now before us on appeal.[50]

### III. THE DISTRICT COURT'S DECISION

The District Court heard the case on cross-motions for summary judgment.[51] Reviewing the Secretary's decision primarily on the administrative record,[52] and limiting its inquiry to whether administrative discretion had been abused,[53] the court answered that question in the affirmative.[54] The court found merit in appellee's contention that "the Secretary failed to make a reasonable and complete determination that

sufficient resident workers [were] able, willing, qualified, and available to perform the labor required by the employer":[55]

> Not only was it clear from the facts gathered that there were very few resident workers who had a sufficient knowledge of three Chinese dialects but, in addition, it is evident that the contact with Mr. Winston Tsai[56] of the Chinese Cultural Association produced only speculation as to whether there were resident workers who, in fact, were "able, willing, qualified and available." . . . There is nothing to show the workers to whom Mr. Tsai referred were willing and able to work for the Acupuncture Center nor was there any indication at all that any of these applicants had a familiarity of acupuncture terminology and science or spoke three Chinese dialects.[57]

The court disagreed with the Secretary's argument "that a knowledge of acupuncture medical terminology is not necessary for this position since it can be learned as part of the on-the-job training":[58]

> It is clear to this Court that in the sensitive setting of medical practice and all the concomitant problems that arise in the course of treatment of the elderly and disabled persons seeking such treatment, it is not unreasonable for an employer to not only desire, but also require, that its employee have familiarity with the termi-

---

48. A.R. 2.

49. A.R. 2.

50. While this appeal was pending, the District of Columbia adopted a regulation containing a provision undertaking to limit the practice of acupuncture to licensed physicians and dentists for a period of one year during which criteria for licensure of other acupuncturists would be formulated. This development prompted us to inquire of counsel as to whether the regulation generated any probability of early mootness, see text *supra* at note 23, and the parties submitted supplemental memoranda addressing that question. The prohibitory provision of the regulation never went into operation, however. It was promptly attacked in court, its enforcement was restrained *pendente lite*, and ultimately it was declared invalid and its operation was permanently enjoined. *Wensel v. Washington*, 103 Wash.L.Rep. 881 (D.C.Sup.Ct.1975) No appeal from that decision was taken. It is

clear, then, that the controversy now before us remains alive.

51. *Acupuncture Center v. Brennan, supra* note 3.

52. See note 70 *infra* and accompanying text.

53. *Acupuncture Center v. Brennan, supra* note 3, 364 F.Supp. at 1039, 1041, 1042.

54. *Id.* at 1042.

55. *Id.* at 1041.

56. See text *supra* at notes 46–47.

57. *Acupuncture Center v. Brennan, supra* note 3, 364 F.Supp. at 1041 (footnote omitted).

58. *Id.* at 1041–1042 (footnote omitted).

nology. Therefore, in not considering this factor as to whether there were "able, willing, *qualified*, and available" applicants, the Secretary abused his discretion . . . .[59]

The court also rejected the Secretary's opposition to appellees' three-Chinese-dialects job requirement[60] as "equally unreasonable":[61]

> The Acupuncture Center's desire to employ an interpreter who is fluent in all three dialects is certainly understandable in light of the need of the acupuncturist for clear and immediate interpretation of the patient's ailments without having to search for one interpreter who may speak his dialect. Every employer is entitled to hire persons who have qualifications that can be utilized in a manner that will contribute to the efficiency and quality of the business. In this regard, three Chinese dialects is not an unreasonable job requisite for an interpreter in an organization that is centered on the skills of five Chinese acupuncturists who have limited or no fluency in English.[62]

Lastly, the court felt that refusal of the labor certification on the facts presented "clearly does not further the 'primary purpose of the labor certification procedure . . . to protect the American labor market and to prevent depression of wages and working conditions' ":[63]

> [T]he record shows, that the plaintiff Acupuncture Center made reasonable attempts through newspaper advertising and other means to find resident workers for this position. Therefore, since there was no sufficient foundation for the Secretary to find that there were resident workers "able, willing, qualified and available," to meet the job requirements found reasonable by the Court, it can only be concluded that defendants in this case did abuse their discretion.[64]

## IV. THE GOVERNING PRINCIPLES

In *Pesikoff v. Secretary of Labor*,[65] we were called upon to determine the nature of the Secretary's obligations under Section 212(a)(14) and the scope of judicial review of their performance.[66] Analysis of the statutory language and history led us to conclude that it "set up a presumption that aliens should not be permitted to enter the United States for the purpose of performing labor because of the likely harmful impact of their admission on American workers."[67] That presumption, we said, "the statutory language makes clear," and "can be overcome only if the Secretary of Labor has determined that the two conditions set forth" therein are satisfied.[68] We emphasized our view

> that the Secretary is not obligated to prove in the case of every alien seeking entry to perform labor that the conditions are not met. Given the presumption of the statute against admission, if the Secretary's consultation of the general labor

---

**59.** *Id.* at 1042 (emphasis by the court).

**60.** See text *supra* at notes 35–36.

**61.** *Acupuncture Center v. Brennan, supra* note 3, 364 F.Supp. at 1042.

**62.** *Id.*

**63.** *Id.*, quoting *Ozbirman v. Regional Manpower Adm'r*, 335 F.Supp. 467, 471 (S.D.N.Y.1971).

**64.** *Acupuncture Center v. Brennan, supra* note 3, 364 F.Supp. at 1042 (footnote omitted).

**65.** *Supra* note 5.

**66.** We held in *Pesikoff* that the prospective employer of an alien for whom § 212(a)(14) certification is sought has standing to challenge a denial of certification. 163 U.S.App.D.C. at

199–201, 501 F.2d at 759–761. Because the employer and the alien had jointly sought judicial review, we deemed it unnecessary to consider whether the alien, who there was outside the United States, might have presented the challenge himself. *Id.* at 199, 501 F.2d at 759. Since Acupuncture Center and Ms. Kao joined in the District Court action and in this appeal, we take the same course here, leaving for possible future consideration the question whether an alien residing in this country has standing to litigate the denial alone. See *Warth v. Seldin*, 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975).

**67.** 163 U.S.App.D.C. at 201, 501 F.2d at 761.

**68.** *Id.*

market data readily available to him suggests that there is a pool of potential workers available to perform the job which the alien seeks, the burden should be placed on the alien or his putative employer to prove that it is not possible for the employer to find a qualified American worker.[69]

Judicial review of the Secretary's decision is confined to examination of the administrative record,[70] and "[i]n order to reverse the Secretary's denial of certification," we added, it must be found "that the denial was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'"[71]

As we have already mentioned, our *Pesikoff* decision was announced while the instant case was on appeal in this court. Consequently, the District Court not only lacked the guidance that *Pesikoff* would have afforded, but also faced holdings outside this circuit that the statute assigned to the Secretary some burden of proof at the ·administrative level.[72] The difference between the District Court's result and our own is primarily attributable to the circumstance that it followed a construction of the governing statute which in *Pesikoff* we declined to adopt.[73]

## V. APPLICATION OF THE PRINCIPLES

While the District Court correctly identified abuse of discretion as the *sine qua non* for judicial intervention,[74] the pervasive theme of its decision was that the Secretary was required "to make a . . . complete determination that sufficient resident workers were able, willing, qualified, and available to perform the labor required by the employer."[75] To be sure, the administrative record does not fully demonstrate that a domestic worker (a) fluent in English and each of the three specified Chinese dialects, and also (b) familiar with acupuncture terminology and practice, (c) was available and (d) was able and willing to accept employment by the Center; but *Pesikoff* holds that the foundation for the Secretary's decision need not be nearly so broad.

■ Section 212(a)(14), as we have said, establishes a presumption against admission of aliens for the purpose of performing labor.[76] The presumption is triggered by the Secretary's consultation with general labor market data suggesting the availability of workers to perform the job

69. *Id.*

70. *Camp v. Pitts*, 411 U.S. 138, 142–143, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106, 111–112 (1973); *SEC v. Chenery Corp.*, 318 U.S. 80, 87–88, 63 S.Ct. 454, 459, 87 L.Ed. 626, 633 (1943); *Chang Wing Cheung v. Hamilton*, 198 F.Supp. 154, 156 (D.R.I.1961), aff'd, 298 F.2d 459 (1st Cir. 1962). *Cf. Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 420, 91 S.Ct. 814, 825–826, 28 L.Ed.2d 136, 155 (1971). During the course of oral argument in the District Court, the judge asked various questions of counsel for Acupuncture Center in an effort to familiarize himself with the Center's operations, and the information sought was later provided in an affidavit submitted by the Center. In light of the Secretary's timely objection, this affidavit should not have been accepted or considered by the District Court. Accordingly, the factual assertions contained therein have been given no weight on appeal.

71. *Pesikoff v. Secretary of Labor, supra* note 5, 163 U.S.App.D.C. at 201 n. 5, 501 F.2d at 761 n. 5, quoting Administrative Procedure Act § 10(e)(2)(A), 5 U.S.C. § 706(2)(A) (1970). See also *Citizens to Preserve Overton Park v. Volpe, supra* note 70, 401 U.S. at 416, 91 S.Ct. at 823, 28 L.Ed.2d at 153; *Secretary of Labor v. Farino*, 490 F.2d 885, 889–890 (7th Cir. 1973); *Song Jook Suh v. Rosenberg*, 437 F.2d 1098, 1102 (9th Cir. 1971).

72. See cases cited in *Pesikoff v. Secretary of Labor, supra* note 5, 163 U.S.App.D.C. at 202 n. 9, 501 F.2d at 762 n. 9.

73. On the core issue of burden of proof, the District Court cited and quoted approvingly from *Golabek v. Regional Manpower Adm'r*, 329 F.Supp. 892 (E.D.Pa.1971), a decision we expressly rejected in *Pesikoff*, 163 U.S.App. D.C. at 202 n. 9, 501 F.2d at 762 n. 9.

74. *Acupuncture Center v. Brennan, supra* note 3, 364 F.Supp. at 1039, 1041, 1042.

75. *Id.* at 1041.

76. See text *supra* at notes 66–69.

which the alien seeks.[77] The burden is then cast on the alien or his would-be employer to show that no qualified domestic worker can be found.[78] A court may overturn the Secretary's determination only if it can be said that he abused his discretion in concluding as he did.[79] We think the administrative record, examined in that light, insulates the Secretary from a finding that his refusal of the labor certification here sought was the product of misguided discretion.

The Secretary was informed that a number of qualified Chinese interpreters generally proficient in one or two Chinese dialects were locally available.[80] Among them was an individual, available for immediate referral, who was fluent in each of the three dialects which the Center had specified.[81] At least two others—one of whom was known to be also available—were fluent in two of the three dialects.[82] The size of the pool fairly indicated that there could well have been more.[83]

To these considerations must be added the Secretary's reservation as to whether, as a threshold matter, a three-dialect facility was essential to the function which the jobholder was supposed to perform. Accepting the Center's explanation as an expression of need for an interpreter to enable communication between Americans and Chinese,[84] and assuming that the Chinese practitioners communicated among themselves in one or more common dialects,[85] the Secretary found it "difficult to understand the requirement for numerous Chinese dialects as a necessity."[86] The Secretary ultimately discarded the require-

ment because "[t]he letter of reconsideration did not sufficiently address the situation to the satisfaction of the Department of Labor for certification of an alien worker";[87] in other words, that the burden of proof in that regard had not been carried. The further requirement of familiarity with acupuncture terminology and technique met a similar fate as too restrictive because, in the Secretary's view, "the acquisition of specific technical jargon is a normal part of on-the-job training received on any job."[88]

■ We cannot say that the Secretary's course of reasoning was irrational. Nor can we characterize the Secretary's demurrer to the application for certification as baseless or arbitrary. The information furnished the Secretary suggests the potential for satisfying the Center's need, even as portrayed by the Center, from the domestic labor market.[89] Beyond that, the data before the Secretary indicated convincingly that the market was fully capable of supplying the need—for an interpreter fluent in less than three Chinese dialects—[90] that the Secretary deemed satisfactorily demonstrated, and we perceive no ground for overruling the Secretary on that score. As we said in *Pesikoff*, "[i]f the Secretary were required to find an individual American worker who met all the personal specifications of the prospective employer of each alien seeking Section 212(a)(14) certification, the burden on him in performing his statutory duty to protect the American labor market would be much greater than Congress intended . . . ."[91] We held that, rather, "[i]t is well within the Secre-

77. See text *supra* at note 69.

78. See text *supra* at note 69.

79. See text *supra* at note 71.

80. See text *supra* at notes 46–47.

81. See text *supra* at note 47.

82. See text *supra* at note 47.

83. See text *supra* at notes 46–47.

84. See text *supra* at notes 33–36.

85. See text *supra* at note 36.

86. See text *supra* at note 48.

87. See text *supra* at note 48.

88. See text *supra* at note 49.

89. See text *supra* at note 47.

90. See text *supra* at notes 48–49.

91. *Pesikoff v. Secretary of Labor, supra* note 5, 163 U.S.App.D.C. at 202, 501 F.2d at 762.

tary's discretion to ignore employer specifications which he deems, in accordance with his labor market expertise, to be irrelevant to the basic job which the employer desires performed."[92] His task, we declared, is simply to locate "a class of workers who, while possibly not meeting the prospective employer's personalized job description, do provide the employer with the potential for getting his job accomplished."[93] We think the administrative record is more than ample to establish that he did that.

No more was required, then, to activate the presumption imposing upon the proponents of certification the burden of proving "that it is not possible for the employer to find a qualified American worker."[94] Nor can we upset the Secretary's implicit conclusion that that was not done. We are mindful, of course, that the Center informed the Secretary that it had been unsuccessful in efforts to locate a suitable domestic interpreter,[95] but in our view that hardly suffices to carry the day. There is nothing to indicate that the Center consulted the sources upon which the Secretary drew,[96] and there is more than enough to suggest that the Center's quest was invariably limited by insistence upon the three-dialect requirement.[97] We are unable, on an abuse-of-discretion basis, to accept this showing as a discharge of the burden of proof sufficient to override the Secretary's determination, under the circumstances, that a certification of unavailability was not warranted.[98]

The judgment appealed from is reversed, and the case is remanded to the District Court for entry of summary judgment in favor of the Secretary.

*So ordered.*

92. *Id.* (footnote omitted).

93. *Id.* at 203, 501 F.2d at 763.

94. *Id.* at 201, 501 F.2d at 761.

95. See text *supra* at note 40.

96. "We think it clear that Congress did not intend Section 212(a)(14) to create an employment placement office in the Department of

Labor . . . ." *Pesikoff v. Secretary of Labor, supra* note 5, 163 U.S.App.D.C. at 204, 501 F.2d at 764.

97. See text *supra* at notes 32–40.

98. Compare *Pesikoff v. Secretary of Labor, supra* note 5, 163 U.S.App.D.C. at 204, 501 F.2d at 764.